# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNIE LARA, | Case No. 1:22-cv-00992-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | (Doc. 1) |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Annie Lara ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II. FACTUAL BACKGROUND

On November 1, 2018, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on January 5, 2016, due to frequent seizures, fatigue, headaches, sciatic nerve pain, thyroid issues, and depression. (Administrative Record ("AR") 17, 63, 82, 317, 318, 356, 368.) Plaintiff was born on November 15, 1970, and was 45 years old on the alleged onset date. (AR 32, 62, 81, 356, 368.) She has at least a high school education and is able to communicate in English.

---
[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (*See* Doc. 11.)

(AR 32, 44, 316, 318.) Plaintiff has past work as a store packer. (AR 32, 57, 329, 354.)

**A.     Relevant Medical Evidence[2]**

In November 2015, Plaintiff reported to her physical therapist that she had a seizure two days earlier. (AR 541.) She also reported that she experienced "mild migraines." (AR 502.)

Plaintiff presented for a brain MRI in September 2018, which was indicated for her clinical history of headaches, seizures, and trouble with speech. (AR 576.) The MRI showed no abnormal enhancement to suggest a focal mass and no evidence of mesial temporal sclerosis. (AR 576.) An EEG performed that same month was abnormal and consistent with a seizure disorder. (AR 600, 1004.)

In October 2018, Plaintiff presented for a follow up appointment with her primary care physician and reported that she had had a seizure a few days earlier, which lasted five minutes. (AR 609, 775.) Her primary care physician referred her to neurology. (AR 610, 776.) Plaintiff complained of headaches in November 2018, which was attributed to sinusitis and rhinitis. (AR 582.)

In February 2019, consultative examiner Robert Wagner, M.D., performed a comprehensive internal medicine evaluation of Plaintiff, who complained of seizures and low back pain. (AR 744–49.) Her medical history was noted to be "significant" for headaches. (AR 745.) Plaintiff was driven to the clinic by another person, and reported her history of seizures since age nine, with her most recent seizure being the day before. (AR 744.) She reported that she experiences seizures about three times a week, which she describes as feeling "noise in her head" and with slurred speech and an inability to speak. (AR 744.) According to Plaintiff, the seizures last a few minutes. (AR 744.) She reported that has always had an active driver's license. (AR 744.) Plaintiff takes Keppra and Tegretol for seizure activity. (AR 744.) She reported that she lives with her significant other and two children, and that she cooks, cleans, drives, shops, performs her own activities of daily living without assistance, and walks some for exercise. (AR 745.) Dr. Wagner characterized Plaintiff's seizures as "absence type seizures," and opined that she should avoid working around

---

[2] As Plaintiff's assertion of error is limited to the ALJ's consideration of Plaintiff's subjective complaints, only evidence relevant to this argument is set forth below.

unprotected heights or heavy machinery.  (AR 748.)

Following lab work, Plaintiff's seizure medication was adjusted in May 2019.  (AR 859, 860.)  In December 2019, Plaintiff reported to her primary care physician that she was having weekly seizure activity.  (AR 848.)  Her medication was adjusted and she was referred to a neurologist for epilepsy.  (AR 848.)

In June 2020, Plaintiff reported to her primary care physician that she is having seizures, which "caus[e] her to go blank."  (AR 1249.)  She reported experiencing "unilateral numbness to the side of her head" with slurred speech once or twice a week for five to ten minutes.  (AR 1249.)  According to Plaintiff, her last neurology assessment was five years earlier.  (AR 1249.)  She denied headaches.  (AR 1250.)  The provider discussed Plaintiff's Keppra level of 9.0, which was "on the low end."  (AR 1249.)  She was again referred to neurology.  (AR 1252.)

In October 2020, Plaintiff underwent a neurology evaluation.  (AR 1135–39.)  She reported that in high school she "outgrew" the grand mal seizures she had as a child and now only has "vocal" symptoms, in that she "knows what she is going to say" and can write it out but the "[w]ords don't come out."  (AR 1135, 1288.)  She reported that there is a "sense of noise in her mind" that warns her "something is coming on."  (AR 1135, 1288.)  Plaintiff has such episodes twice a week and they last one to twelve minutes.  (AR 1135, 1288.)  The neurologist reduced one of Plaintiff's seizure medications and requested that Plaintiff "[p]rovide written documentation during the events of unable to speak."  (AR 1138, 1291.)  In November 2020, Plaintiff attended a seizure medication refill appointment.  (AR 1153.)  She denied any "recent seizure-like activity."  (AR 1153.)

Plaintiff presented for a follow up with a neurologist in March 2021.  (AR 1126–28, 1278–90.)  She reported "doing ok" and that her last seizure was two days earlier, which lasted "15 seconds" and she described as "noise in her head."  (AR 1126, 1278.)  She also stated that she had "trouble speaking" during the episodes, which occurred four to five times per week, but she did not lose consciousness.  (AR 1126, 1278.)  Plaintiff reported that in the past two months she "noted less frequent bigger seizures" and "felt better" when her medication was adjusted.  (AR 1126, 1278.)  She also reported that she gets migraines three to four times per month and that the headaches can last one to one-and-a-half days.  (AR 1126, 1278.)  The neurologist increased her seizure medication

3

and prescribed pain medication.  (AR 1126–27, 1278–79.)

In June 2021, Plaintiff reported to her primary care physician a diagnosis of migraines.  (AR 1213.)  She stated that she gets a headache two to three times per week.  (AR 1213.)  The provider assessed Plaintiff with "chronic tension-type headache."  (AR 1214.)  She noted her impression that Plaintiff's headaches "may be abdominal migraine."  (AR 1215.)

**B.     Plaintiff's Statement**

In December 2018, Plaintiff completed an "Adult Function Report."  (AR 344–51.)  She reported that her seizures interrupt her speech in the middle of a conversation.  (AR 344.)  Plaintiff stated she could prepare complete meals or sandwiches, but if seizures were present that day, she would not use the stove, only the microwave.  (AR 47–48, 346.)  She reported that she goes outside almost every day and can drive and shop in stores.  (AR 347.)  According to Plaintiff, she reads and watches television daily, and plays Bingo two or three times per month.  (AR 348.)  She also socializes with others, visits restaurants, and attends church on a regular basis.  (AR 348.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on March 22, 2019, and again on reconsideration on June 19, 2019.  (AR 17, 105–110, 112–17.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 118–56.)  At the hearing on March 15, 2022, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions.  (AR 44–57.)

**1.     Plaintiff's Testimony**

Plaintiff testified that she had previously kept a seizure journal, but only to provide to one doctor, whom she had not seen for very long.  (AR 47.)  She stated that she was experiencing headaches about two to three days per week that would last up to five hours, and that she would need to rest for the remainder of the day.  (AR 47–48.)  She also needed to rest for the remainder of the day if she experienced a seizure.  (AR 48.)

Plaintiff testified that her "biggest problem" with her seizures was her speech, and that she had had one episode in which she could not speak for 45 minutes.  (AR 49, 50.)  According to Plaintiff, she had trouble speaking due to seizure symptoms three to four times per week.  (AR 50.)

4

She testified that she takes medication for seizures and migraines, but she had not been to the emergency department for those symptoms for years prior to the hearing. (AR 50–51.)

Plaintiff testified that she took a nap every day for at least an hour, but all day if she had a seizure or headache. (AR 55.) She also cannot focus or concentrate on days when she has a seizure or headache. (AR 56.)

Plaintiff testified that she has a driver's license and that she "only drive[s] to church on Sundays." (AR 46.) She can take care of her personal care so long as she not experiencing seizures or migraines. (AR 52.) According to Plaintiff, she can cook meals and clean up, but that she cannot do so on "seizure and migraine days." (AR 52.) Plaintiff testified that on those days, she can do "[a]bsolutely nothing" and must rest. (AR 52.) She no longer plays Bingo because she cannot sit for that long. (AR 53.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a hand packager. (AR 57.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and past work history. (AR 58.) The VE was also to assume this person is limited to a light exertional level, but that she was limited to jobs that do not require the use of ladders, ropes, or scaffolds. (AR 58.) The individual could occasionally climb stairs and ramps. (AR 58.) The individual could occasionally bend, balance, crouch, stoop, and kneel, but never crawl (AR 58.) The individual could frequently push and pull with her lower extremities. (AR 58.) The individual would be limited to jobs that do not have exposure to dangerous machinery or moving machine parts as well as unprotected heights, and would need to avoid concentrated exposure to extreme cold or heat, vibration, or poorly ventilated workspaces. (AR 58.) The individual could handle, finger, feel, and frequently reach with the bilaterally upper extremities. (AR 58.) The VE testified that such a person could not perform Plaintiff's past work, but could perform other light jobs in the national economy with a specific vocational preparation (SVP)[3] of 2, such as office helper, Dictionary of Operational

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id*.

Titles (DOT) code 239.567-010; information clerk, DOT 237.367-018; and mail sorter, DOT code 209.687-026. (AR 58–59.)

The ALJ asked the VE to consider a person with the same limitations as in the first hypothetical, but with additional limitations that she could handle, finger, feel, and reach only occasionally with her bilateral upper extremity. (AR 59.) The VE testified that there would be no work such a person could perform. (AR 59.) The VE further testified that being off task more than 10% of the workday, or missing two or more days of work per month, is work preclusive. (AR 55.)

The ALJ asked the VE to consider a third hypothetical regarding the first hypothetical person but with the additional limitations that the person would require additional breaks of ten minutes each hour beyond normal breaks, and/or miss two days a month from an inability to concentrate on tasks, persist in job duties, or to remain on a necessary job pace due symptoms, limitations, treatment, and side effects, including a need to elevate the legs for several hours each day. (AR 60.) The VE testified that such limitations would "exceed employee tolerance," such that there would "be no competitive employment." (AR 60.) In response to Plaintiff's attorney, the VE further testified that the need for additional breaks and absenteeism "each on their own would preclude work." (AR 60.)

**D.    The ALJ's Decision**

In decision dated April 14, 2022, the ALJ found that Plaintiff was not disabled. (AR 17–31.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 19–31.) The ALJ decided that Plaintiff met the insured status requirements of the Act through March 31, 2023, and she had not engaged in substantial gainful activity since January 5, 2016, the alleged onset date (step one). (AR 19.) At step two, the ALJ found Plaintiff's following impairments to be severe: lumbar degenerative disc disease, sacroiliitis, cervical spondylosis, internal derangement of the left knee, right knee chondromalacia patella, seizure disorder, and chronic headaches. (AR 20–23.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 23–24.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that, through the date last insured, Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 404.1567(b) except that she is limited to jobs that do not require the use of ropes, ladders, or scaffolds. She can occasionally climb ramps and steps. She can occasionally balance, bend, stoop, and kneel, but never crawl. She can frequently push and pull with the lower extremities. She is limited to jobs that do not have exposure to dangerous machinery or moving machine parts, as well as unprotected heights. She needs to avoid concentrated exposure to extreme cold or heat, vibration, or poorly ventilated workspaces. She can handle, finger, feel, and reach frequently with her bilateral upper extremities.

(AR 24–31.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" they rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 25.) The ALJ determined that Plaintiff was unable to perform her past relevant work (step 4), but was not disabled because, given her RFC, she could perform a significant number of other jobs in the local and national economies, specifically office worker, information clerk, and mail sorter (step 5). (AR 31–33.) The ALJ concluded Plaintiff was not disabled at any time from January 5, 2016, through the date of the decision. (AR 33.)

Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on June 7, 2022. (AR 5–10.) Therefore, the decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

### III.     LEGAL STANDARD

**A.     Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work."

*Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

9

454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV. DISCUSSION

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's statements regarding her seizure disorder symptoms. (Doc. 14 at 5–9; Doc. 17 at 2–7.) The Acting Commissioner responds that the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations. (Doc. 16 at 7–15.) The Court agrees with the Acting Commissioner.

**A. Legal Standard**

The test for deciding whether to accept a claimant's subjective symptom testimony turns on whether the claimant produces medical evidence of an impairment that reasonably could be expected to produce the symptoms alleged. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1281–82 & n.2 (9th Cir. 1996). The Commissioner may not discredit a claimant's testimony on the severity of symptoms merely because they are unsupported by objective medical evidence. *Reddick*, 157 F.3d at 722*; Bunnell*, 947 F.2d at 343, 345. If the ALJ finds the claimant's testimony not credible, the ALJ "must specifically make findings which support this conclusion." *Bunnell*, 947 F.2d at 345. The ALJ must set forth "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 345-46. Unless there is evidence of malingering, the ALJ can reject the claimant's testimony about the severity of a claimant's symptoms only by offering "specific, clear and convincing reasons for doing so."[5] *Smolen*, 80 F.3d at 1283-84; *see also Reddick*, 157 F.3d at 722. The ALJ must identify what

---

[5] The Court disagrees with the Acting Commissioner that a lesser legal standard applies. (*See* Doc. 16 at 7 n.4.)

testimony is not credible and what evidence discredits the testimony. *Reddick*, 157 F.3d at 722; *Smolen*, 80 F.3d at 1284.

**B.     Analysis**

As noted above, in determining Plaintiff's RFC, the ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms. (AR 22.) The ALJ, however, also found that Plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were "not entirely consistent" with the RFC. (AR 22.) Because the ALJ did not make any finding of malingering, the ALJ was required to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective symptom allegations. *Smolen*, 80 F.3d at 1283-84; *Tommasetti*, 533 F.3d at 1039–40. Here, the ALJ provided at least three valid reasons for not fully recrediting Plaintiff's statements regarding her seizure disorder symptoms.

        **1.     Inconsistency with Medical Evidence**

Plaintiff testified that she can do "absolutely nothing" on days that she experiences a seizure or headache, which is two to three days per week, and must instead rest all day. (AR 47–48, 52.) However, the ALJ found this testimony to be inconsistent with the medical record, which shows that Plaintiff worked despite her seizure condition and that there was "no significant change in her reported seizure activity around her alleged onset date." (AR 29.) The ALJ further found that the medical record lacks documented reports of "serious or frequent symptoms" or "serious limitations associated with these conditions." (AR 29.)

An ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of [the impairment]." *Burch*, 400 F.3d at 680. Nonetheless, "lack of medical evidence . . . is a factor that the ALJ can consider in [their] credibility analysis." *Burch*, 400 F.3d at 681. *See also Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

In this case, the record demonstrates that Plaintiff has had seizures since she was nine years old. (AR 744.) Despite this, she worked as a packager at Best Buy from 2000 until March 2016, after her alleged onset date. (AR 355. *See also* AR 317–19.) A summary of 362 pages of Plaintiff's

11

treatment notes by an independent medical examiner does not indicate any significant change in seizure activity around her alleged onset date. (AR 1087, 1092–93.) Nor does the medical record contain documented reports of worsening symptoms or serious limitations associated with Plaintiff's headaches or seizures. Shortly before the relevant period, Plaintiff described her headaches as "mild." (AR 502.) On several occasions, Plaintiff failed to mention any headache symptoms associated with her seizure disorder at all (*see* AR 744, 1135, 1288), and, in June 2020, expressly denied headaches (AR 1250). Plaintiff reports of her seizure disorder during the relevant period, while consistent, similarly do not indicate any increase in frequency or severity during this time. (AR 609, 776 (October 2018: incidence of a five-minute seizure); AR 744 (February 2019: seizures affect ability to speak, occur three times per week, and last a few minutes); AR 848 (December 2019: "weekly" seizure activity reported); AR 1135, 1288 (October 2020: seizure episodes occur twice a week, last one to twelve minutes, and cause an inability to speak); AR 1153 (November 2020: denying any "recent seizure-like activity"); AR 1126, 1278 (March 2021: seizures occurred four to five times per week, during which she had "trouble speaking").)

Despite bearing the burden of proving her disability, Plaintiff does not point to any evidence to the contrary. *See Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (noting that claimant bears burden of proving that she is disabled and must present "complete and detailed objective medical reports of her condition from licensed medical professionals"). The record does not contain any opinions from treating or examining physicians indicating that Plaintiff is disabled as a result of her seizure disorder or that she has limitations greater than those determined in the ALJ's decision. Plaintiff does not challenge, for example, the ALJ's consideration of the opinion of the consultative examiner, Dr. Wagner, who found that Plaintiff's seizure disorder warrants only environmental limitations (AR 748), all of which the ALJ incorporated in Plaintiff's RFC (AR 24). While she obviously disagrees with the ALJ's assessment of the medical record, Plaintiff fails to articulate exactly how the record supports her belief that her seizure disorder and headaches result in greater limitations than those found by the ALJ. Instead, Plaintiff criticizes the ALJ's "general citations to entire exhibits," suggesting that the ALJ's citations to the record render their reasoning "not sufficiently specific" enough to be clear and convincing. (*See* Doc. 14 at 6 (citing *Brown-Hunter v.*

*Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).) Had the ALJ only cited to entire exhibits in rejecting Plaintiff's subjective statements, Plaintiff's argument might have merit. However, the ALJ thereafter cited to specific records within these exhibits, summarized above, that support their conclusion that Plaintiff's claims of total disablement are uncorroborated by the medical record. *See Batson v. Comm'r of Soc. Sec*., 359 F.3d 1190, 1193 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record").

For the foregoing reasons, the Court finds the ALJ's conclusion that the evidentiary record does not support, and in fact undermines, Plaintiff's subjective statements is supported by substantial evidence. The ALJ's determination that Plaintiff's complaints are inconsistent with the objective medical evidence is therefore a clear and convincing reason for discounting her subjective symptom testimony. *See Molina*, 674 F.3d at 1113 (concluding that the ALJ properly discredited claimant testimony based on inconsistencies with objective medical evidence).; 20 C.F.R. § 404.1529(c)(3).

### 2. Conservative Treatment

The ALJ also noted that, despite Plaintiff's statements of total disablement as a result of her seizure disorder, the medical record shows that she did not regularly treat with a neurologist, and that her first visit with a neurologist during the relevant period was not until October 2020. (AR 29 (citing AR 1135–39); *see also* AR 1249 (reporting last neurology assessment occurred in 2015).) The ALJ also observed that the "level" of Keppra, a medication used to treat Plaintiff's seizure disorder, was noted to be relatively low. (AR 29 (citing AR 1249).) Plaintiff had no emergency room visits or hospitalizations for seizures or headaches during the relevant period. (AR 25, 50–51.) While one imaging study was positive for seizure disorder (AR 600, 1004), another showed no brain lesions, scarring, or masses (AR 576).

Plaintiff does not dispute any of the foregoing evidence. She instead asserts the ALJ's reasoning is "belied by the record" because Plaintiff's Keppra level is not an "indicator of . . . whether the dosage or treatment is conservative." (Doc. 17 at 5–6.) But, as Plaintiff herself points out, a Keppra level of 9.0, as was noted in June 2020, is not "effective." (*Id*. at 6 (quoting *Peters v. Colvin*, No. CV 13-8907-JPR, 2015 WL 349421, at *7 n.9 (C.D. Cal. Jan. 23, 2015) ("Levetiracetam [Keppra] must be present at a concentration of between 12 and 46 mcg/mL to be effective.").) It

13

was reasonable, then, for the ALJ to conclude that Plaintiff's Keppra regimen was conservative, given the evidence showing it at a sub-therapeutic level in her system.

In arguing that her treatment was not conservative, Plaintiff also points to the fact that she was taking another seizure medication (carbamazepine/Tegretol), in addition to Keppra. (*See* Doc. 17 at 6.) While true, it does not undermine the ALJ's conclusion. *See, e.g., Pena v. Comm'r of Soc. Sec.*, No. 1:21-CV-00301-EPG, 2022 WL 4237887, at *5 (E.D. Cal. Sept. 14, 2022) (adopting the ALJ's characterization of treatment with Keppra and another seizure medication as "conservative treatment"); *Frias v. Colvin*, No. EDCV 13-0932-MAN, 2015 WL 1005339, at *4 (C.D. Cal. Mar. 4, 2015) (same). Plaintiff's course of treatment, with minimal neurology involvement and no hospitalizations, stands in stark contrast to that at issue in *Federico v. Comm'r of Soc. Sec. Admin.*, where the plaintiff "was prescribed at least three antiseizure medications (Tegretol, Keppra, and Depakote), she frequently sought treatment in the emergency room, she was transported to the hospital via ambulance on multiple occasions, and she has undergone numerous imaging studies and had many appointments relating to her seizure disorder." No. CV-20-00508-TUC-RCC (MSA), 2022 WL 17481775, at *3 (D. Ariz. June 30, 2022). Moreover, at a neurology follow up appointment in March 2021, Plaintiff reported that in the past two months she noted fewer "bigger seizures" and "felt better" when her medication was adjusted (AR 1126, 1278). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Given the substantial evidence of a conservative treatment regimen used to treat Plaintiff's seizure disorder, the ALJ was entitled to discount Plaintiff's credibility on this basis. *See, e.g., Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ may properly rely on the fact that only conservative treatment has been prescribed).

### 3. Activities of Daily Living

Finally, the ALJ determined that Plaintiff's claim of total disability is inconsistent with her "reported significant activities." (AR 25.) The ALJ noted that at the consultative examination by

14

Dr. Wagner, Plaintiff reported that she had active driver's license and "continued to drive." (AR 29.) She also told Dr. Wagner that she had the ability to cook, clean, shop, perform her own activities of daily living without assistance, and walk for exercise. (AR 27.) In her written statement, Plaintiff reported that she goes outside almost every day and can drive and shop in stores. (AR 347.) She socializes with others, visits restaurants, and attends church on a regular basis. (AR 348.) She also played Bingo monthly during the relevant period. (AR 347.) At the hearing, Plaintiff testified that she no longer plays, not because of seizure activity but because she cannot sit for the five hours it takes to play. (AR 53.)

An ALJ may properly consider a claimant's daily activities when evaluating credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (the nature of daily activities may be considered when evaluating credibility). Moreover, in evaluating a claimant's credibility, an ALJ may consider inconsistencies between the claimant's testimony and the claimant's conduct and whether the claimant engages in daily activities inconsistent with the alleged symptoms. *Molina*, 674 F.3d at 1112. Even where those activities suggest some difficulty functioning, they are grounds for discrediting Plaintiff's testimony to the extent that they contradict claims of a totally debilitating impairment. *Id.* at 1113.

The Court finds that the above-described activities tend to suggest, as the ALJ concluded, that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the representative occupations identified by the ALJ (*see* AR 33). *See Fair*, 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained their reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F. App'x 674, 677 (9th Cir.

2012) (holding that ALJ properly made an adverse credibility finding because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Nelson v. Colvin*, No. 1:15-cv-00696-SKO, 2016 WL 3407627, at *20 (E.D. Cal. June 20, 2016) (ALJ properly discredited subjective complaints of claimant who suffered from chronic back problems where claimant engaged in activities such as preparing simple meals, washing dishes, driving a car, shopping for groceries and household supplies 2–3 times a week, walking up to a mile, using a computer for about half an hour at a time, visiting with family, mopping and vacuuming, independently handling her own finances, and doing yoga tapes at home.).

The record also contains, as Plaintiff points out, some contrary evidence, such as her testimony that she only drives on Sundays to church. (*See* AR 46.) The ALJ's decision recognized that Plaintiff has some work limitations because of seizure activity. (*See* AR 24 (incorporating the workplace environmental limitations opined by Dr. Wagner in Plaintiff's RFC) [6]; *see also* AR 31 ("Given the claimant's musculoskeletal impairments, in combination with her history of seizures and headaches, the undersigned has found she would be limited to jobs that do not require the use of ropes, ladders, or scaffolds, and with the above environmental limitations.").) The Court concludes that the ALJ properly discredited Plaintiff's testimony that her limitations render her ***completely*** unable to work, however. *Fair*, 885 F.2d at 604; *see also Bunnell*, 947 F.2d at 346 ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence."). Where the ALJ makes a reasonable interpretation of Plaintiff's testimony, it is not the Court's role to second-guess it. *Rollins*, 261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

In sum, the Court finds the ALJ discounted Plaintiff's subjective symptom allegations related to her seizure disorder and headaches for at least three clear and convincing reasons supported by

---

[6] Dr. Wagner also emphasized Plaintiff's possession of an active driver's license in opining only environmental limitations because of her seizure disorder and headaches, which Plaintiff does not challenge. (*See* AR 748 (Plaintiff "apparently has been cleared for a driver's license . . .").)

substantial evidence.

## V. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: __**September 6, 2023**__              /s/ *Sheila K. Oberto*
                                                                UNITED STATES MAGISTRATE JUDGE